Filed 9/5/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE LAW FIRM OF FOX AND FOX,<br><br>      Plaintiff and Appellant,<br><br>      v.<br><br>CHASE BANK, N.A.,<br><br>      Defendant and Respondent. | B319265<br><br>(Los Angeles County<br>Super. Ct. No.<br>20STCV14405) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Maureen Duffy-Lewis, Judge. Reversed with directions.

The Law Firm of Fox and Fox and Frank O. Fox for Plaintiff and Appellant.

Cozen O'Connor and Brett D. Watson for Defendant and Respondent.

———————————————

The Law Firm of Fox and Fox (Law Firm) appeals from a judgment entered after the trial court granted summary

judgment in favor of Chase Bank, N.A. In 2020 the Law Firm filed this action against Chase alleging negligence in the disbursement of funds from a blocked account containing estate funds to the sole signatory on the account (as administrator of the estate), Jazzmen Brumfield (Brumfield). The Law Firm represented Brumfield as the administrator in the probate proceedings following the death of her father. The Law Firm alleged Chase was negligent in disbursing the entirety of the estate funds to Brumfield despite a probate court order specifying that Brumfield would receive at most $16,000 from the account, with most of the remaining funds to be paid to the Law Firm (and then to other beneficiaries as funds became available). On January 13, 2022 the trial court granted Chase's motion for summary judgment, concluding Chase owed no duty of care to the Law Firm and had complied with the probate court order.

On appeal, the Law Firm contends it raised triable issues of fact with respect to whether Chase owed a duty to the Law Firm, whether Chase breached any such duty, and whether Chase's conduct in distributing the funds to Brumfield (who absconded with the funds) was the proximate cause of the Law Firm's damages. We conclude Chase owed the Law Firm a duty of care based on the special relationship it had with the Law Firm as an intended beneficiary of the probate court's order directing that the estate funds be deposited into a blocked account from which withdrawals could only be made "on court order" (blocked account order) and Chase's acceptance of that order by executing the "receipt and acknowledgment of order for the deposit of money into blocked account" (acknowledgment) (capitalization omitted). Chase certified in the acknowledgment

2

that "no withdrawal of principal or interest from this account will be permitted without a signed court order."

In finding a duty, we consider the factors first articulated by the Supreme Court in *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*). Although banks do not generally have a duty to police customer accounts for suspicious activity, Chase owed the Law Firm, as an intended beneficiary of the blocked account order and acknowledgment, a duty to act with reasonable care in limiting distributions from the blocked account to those authorized by court order.

Chase contends it properly distributed all of the blocked funds pursuant to the probate court's order approving final account and report of administrator in the matter of *In re Estate of Lamont Brumfield* (the final probate order), which approved the final account and set the amounts Brumfield and the Law Firm were "authorized" to receive before payment of the beneficiaries. However, the order did not direct Chase to pay specific amounts to Brumfield or the Law Firm, and therefore, distribution of all the funds (or any funds) in the blocked account to Brumfield was unauthorized absent a further court order. Accordingly, there were triable issues of fact whether Chase breached its duty and whether that breach caused the Law Firm harm by allowing Brumfield to withdraw all the funds in the account. We reverse.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Disbursement of Funds in the Probate Case[1]*

Brumfield hired the Law Firm[2] to represent her as the administrator of the estate of Lamont Brumfield in the probate case, *In re Estate of Lamont Brumfield* (Super. Ct. L.A. County, 2017, No. 17STPB05296).  On June 25, 2018 the probate court entered the blocked account order, which confirmed the sale of real property belonging to the estate and directed the establishment of a blocked account with Chase.  The order specified:  "Net sale proceeds must be deposited by escrow holder in a blocked account to be withdrawn only on court order. Receipts must be filed."

The blocked account order was presented to Chase on October 31, 2018.  The same day, Chase opened a blocked account and deposited into the account the net proceeds from the sale in the amount of $63,383.47.  On November 7, 2018 an attorney-in-fact for Chase executed the acknowledgment using Judicial Council Form MC-356.  By signing the form, Chase (through its attorney-in-fact) acknowledged receipt of the blocked account order and certified that no withdrawal from the blocked account would be permitted "without a signed court order under this case name and number, bearing the seal of this court."  Brumfield was designated as the administrator and only authorized signatory on

---

[1]    The factual background is taken from evidence submitted by the parties in connection with Chase's motion for summary judgment.  We note where the facts are in dispute.

[2]    The Law Firm is a general partnership composed of Frank Fox and Claire Fox.  Further unspecified references to Fox refer to Frank Fox.

the account.  Brumfield signed a personal signature card that also identified her as the only authorized signatory on the account.

On December 20, 2019 the probate court issued the final probate order closing administration of the estate.  The order provided in paragraph 2 that Brumfield was "authorized and directed to receive statutory compensation for services rendered, in the sum of $16,000.00."  Paragraph 3 provided the Law Firm was "authorized and directed to receive:  [¶]  a. Statutory compensation for services rendered, in the sum of $16,000.00;  [¶] b. Extraordinary compensation for legal services rendered, in the sum of $44,151.25; and  [¶]  c. Costs, in the sum of $6,173.39." The order specified that "[t]he amounts detailed in paragraphs 2 and 3, above, shall be paid from the balance of the funds remaining ($47,383.47) and the unpaid balance, from any currently unknown assets of the Decedent later discovered."

The final probate order also provided for distribution of the balance of the funds remaining in the account to pay creditor's claims by the California Department of Child Support Services in specific amounts, and if there were any remaining assets, distribution in equal shares to Brumfield and minors Nehemiah Brumfield and Chaz Brumfield.  Finally, the order closed the administration of the estate.

Fox drafted and lodged with the probate court the final probate order.  Only Fox appeared at the hearing for the final account and report of administrator.[3]

---

[3]     Neither party designated the reporter's transcript for inclusion in the appellate record.

5

On January 14, 2020 Fox and Brumfield brought the final probate order to a Chase branch and presented it to Sergio Chun, a private client banker. According to Fox, he advised Chun that no funds could be distributed from the blocked account without both Fox and Brumfield being physically present. Fox further instructed Chun that the funds were to be paid separately to Fox and Brumfield directly from the account. Fox stated in his declaration that Chun agreed to these terms, but Chase disputed that Chun agreed (or had authority to agree). Chun stated in his declaration that he informed Fox and Brumfield that no one at the branch level was authorized to review court documents or release funds held in blocked accounts. He said he would forward the final probate order to the appropriate Chase department and offered to call Fox and Brumfield when a decision was made regarding the final probate order and the blocked account.

According to a declaration from John M. Chiavacci, a Chase transaction specialist, Brumfield made a "series of withdrawals from the [b]locked [a]ccount" from January 21 to January 23, 2020.[4] It is undisputed that Brumfield withdrew the entirety of the funds in the blocked account.

B.    *This Lawsuit, the Demurrers, and the Grant of Summary Judgment in Favor of Chase*

On April 14, 2020 the Law Firm filed this action alleging a single cause of action for negligence against Chase. After Chase filed a demurrer, the Law Firm filed a verified first amended complaint on September 15, 2020. The first amended complaint

---

[4]    The Chiavacci declaration refers to withdrawals in 2021, but it is clear from the record that this is a typographical error and Chiavacci intended to refer to withdrawals in 2020.

identified Brumfield as Doe 1. Chase demurred again, and on January 22, 2021 the trial court overruled the demurrer and denied Chase's accompanying request for judicial notice, reasoning Chase's arguments "go outside the pleading."

Chase filed its motion for summary judgment on October 12, 2021. Chase primarily argued, as it does on appeal, that it owed no duty to the Law Firm. Chase asserted seven arguments: (1) banks have limited general duties toward their depositors; (2) banks have limited general duties to noncustomers; (3) the economic loss rule barred recovery; (4) Chase and the Law Firm did not have a fiduciary relationship; (5) there was a lack of foreseeability of harm; (6) the narrow duty placed on banks to guard against specific types of check fraud did not apply; and (7) Chase had only a limited duty "to keep the funds frozen in the [b]locked [a]ccount until the court determined that the funds could be released," and it satisfied this duty by waiting to release the funds until the final probate order unblocked the account.[5] Chase also asserted the Law Firm could not show causation because once the funds were unblocked pursuant to the court order, Chase had no choice but to disburse them to Brumfield, and it was Brumfield who caused the injury.

In its opposition the Law Firm argued Chase owed the Law Firm a duty based on a special relationship arising from the probate proceedings that required Chase to exercise due care in distributing funds from the blocked account. The Law Firm

---

[5] Chase's arguments at times conflated duty and breach (as they do on appeal). To the extent Chase argued it fully complied with its duties under the final probate order, Chase was actually arguing it did not breach its duty to reasonably comply with orders of the court.

7

further asserted that the factors set forth in *Biakanja, supra*, 49 Cal.2d 647 supported imposition of a duty. Moreover, the final probate order did not direct Brumfield to withdraw money to pay the Law Firm, but rather, directed Chase to pay the specified funds directly to the named recipients.

In its reply, Chase reiterated the seven theories it had advanced in its opening memorandum without addressing the *Biakanja* factors. Chase also submitted evidentiary objections to two statements in the Fox declaration in support of the Law Firm's opposition.[6]

On January 13, 2022, after hearing argument from counsel, the trial court granted Chase's motion for summary judgment, reasoning, "The demurrer was overruled because the argument brought in facts outside the pleading. Summary judgment allows those facts to be considered. It is undisputed that [Brumfield] was the customer, not Fox, and that [the] Bank did exactly [what] it was told to do by the underlying order. By law, there is no liability on the Bank and summary judgment must be granted." The court did not rule on Chase's evidentiary objections to the Fox Declaration.[7]

---

[6] The challenged assertions were as follows: (1) "'The order mandates that payment of the amounts to Plaintiff shall be made directly from the blocked account with Chase, not indirectly, via Ms. Brumfield or any other person'" and (2) "'Mr. Chun stated that he understood and agreed to comply with these terms.'"

[7] Where the trial court fails to rule on evidentiary objections in the context of a summary judgment motion, on appeal we presume the objections have been overruled, with the objector having the burden to renew its objections on appeal. (*Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 534.) Chase does not

8

The Law Firm appealed from the January 13, 2022 order granting summary judgment. On June 24, 2022 the trial court entered judgment in favor of Chase.[8]

## DISCUSSION

A. *Standard of Review on Summary Judgment*

Summary judgment is appropriate only if there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618 (*Regents*); *Doe v. Roman Catholic Archbishop of Los Angeles* (2021) 70 Cal.App.5th 657, 668.) "'"'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.'" [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of

challenge the trial court's evidentiary rulings on appeal and has forfeited any challenge to the rulings. (*Villanueva v. City of Colton* (2008) 160 Cal.App.4th 1188, 1197; *Roe v. McDonald's Corp.* (2005) 129 Cal.App.4th 1107, 1114.)

[8] After we notified the Law Firm that the order granting summary judgment was not appealable, the Law Firm filed a response attaching the June 24, 2022 judgment. We consider the Law Firm's premature notice of appeal a valid "notice of appeal filed after judgment is rendered but before it is entered" and treat the notice as filed immediately after entry of judgment. (Cal. Rules of Court, rule 8.104(d)(1); see *Silva v. Langford* (2022) 79 Cal.App.5th 710, 715, fn. 6; *Valdez v. Seidner-Miller, Inc.* (2019) 33 Cal.App.5th 600, 607.)

that party.""" (*Hampton v. County of San Diego* (2015) 62 Cal.4th 340, 347; accord, *Doe*, at p. 669.)

A defendant moving for summary judgment has the initial burden of presenting evidence that a cause of action lacks merit because the plaintiff cannot establish an element of the cause of action or there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2); *Regents, supra*, 4 Cal.5th at p. 618; *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853.) If the defendant satisfies this initial burden, the burden shifts to the plaintiff to present evidence demonstrating there is a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar*, at p. 850.) "The plaintiff . . . shall not rely upon the allegations or denials of its pleadings to show . . . a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists." (Code Civ. Proc., § 437c, subd. (p)(2); accord, *Roman v. BRE Properties, Inc.* (2015) 237 Cal.App.4th 1040, 1054 ["It is fundamental that to defeat summary judgment a plaintiff must show 'specific facts' and cannot rely on allegations of the complaint."].)

B.      *Chase Owed a Duty of Care to the Law Firm as an Intended Beneficiary*

The four elements of a negligence claim are well established: (1) duty; (2) breach; (3) proximate causation; and (4) injury. (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 213 (*Brown*) ["To establish a cause of action for negligence, the plaintiff must show that the 'defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury.'"]; *Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1158; *Nally v. Grace*

10

*Community Church* (1988) 47 Cal.3d 278, 292.) In moving for summary judgment, Chase argued the Law Firm could not establish three of the elements: duty, breach, and causation. We agree with the Law Firm that Chase owed the Law Firm a duty of care, and the Law Firm has created a triable issue of fact as to breach and causation.

### 1. *Duty of care owed to third parties*

"Whether a duty exists is a question of law to be resolved by the court." (*Brown, supra*, 11 Cal.5th at p. 213; accord, *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 398 (*Gas Leak Cases*).) The general rule governing duty of care is set forth in Civil Code section 1714. (*Brown*, at p. 213.) Civil Code section 1714, subdivision (a), provides, "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person . . . ." Under this provision, "[i]n general, each person has a duty to act with reasonable care under the circumstances." (*Regents, supra*, 4 Cal.5th at p. 619; accord, *Gas Leak Cases*, at p. 398 ["In California, the 'general rule' is that people owe a duty of care to avoid causing harm to others and that they are thus usually liable for injuries their negligence inflicts."].)

However, "[d]uty is not universal; not every defendant owes every plaintiff a duty of care. A duty exists only if "'the plaintiff's interests are entitled to legal protection against the defendant's conduct.'"" (*Brown, supra*, 11 Cal.5th at p. 213; accord, *Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 920 (*Sheen*).) For example, "[t]he law does not impose the same duty on a

11

defendant who did not contribute to the risk that the plaintiff would suffer the harm alleged." (*Brown*, at p. 214.)

A significant exception to the general duty of care under Civil Code section 1714 applies where the defendant causes only economic loss, commonly called the "economic loss rule." (*Sheen, supra*, 12 Cal.5th at p. 922 ["The [economic loss rule] is deceptively easy to state: In general, there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage."]; *Gas Leak Cases, supra*, 7 Cal.5th at p. 406 [liability in negligence for "purely economic losses" is "the exception, not the rule"].)

This case presents such a situation—the Law Firm alleges it suffered solely an economic loss as a result of Chase's negligence in releasing all the funds in the blocked account to Brumfield. Although the economic loss rule is therefore implicated, there is an exception to the rule's limitation on liability where the plaintiff and defendant have a special relationship and policy considerations support finding a duty. (*Gas Leak Cases, supra*, 7 Cal.5th at p. 400; *J'Aire Corp. v. Gregory* (1979) 24 Cal.3d 799, 804 (*J'Aire*).) As the Supreme Court explained in *Gas Leak Cases*, "The primary exception to the general rule of no recovery for negligently inflicted purely economic losses is where the plaintiff and the defendant have a 'special relationship.' [Citation.] What we mean by special relationship is that the plaintiff was an intended beneficiary of a particular transaction but was harmed by the defendant's negligence in carrying it out." (*Gas Leak Cases*, at p. 400.)

This case falls squarely within the rubric of a special relationship as first articulated by the Supreme Court in *Biakanja, supra*, 49 Cal.2d 647. There, the Supreme Court held a

12

notary public who negligently drafted a will for the decedent owed a duty of care to an estate beneficiary who was not in contractual privity with the notary public but was the intended beneficiary of the transaction. (*Id*. at pp. 650-651.) As the Supreme Court later explained, "A special relationship existed between the intended beneficiary and the notary in *Biakanja* . . . because 'the "end and aim" of the transaction' between the nonparty decedent and the notary was to ensure that the decedent's estate passed to the intended beneficiary." (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 400, quoting *Biakanja*, at p. 650; see *J'Aire, supra*, 24 Cal.3d at pp. 802, 804-805 [third-party lessee who operated a restaurant sufficiently alleged a cause of action for negligence based on construction delays against a contractor hired by the owner of the building to renovate the restaurant based on the special relationship between the contractor and lessee]; cf. *Brown, supra*, 11 Cal.5th at p. 215 ["In a case involving harm caused by a third party, a person may have an affirmative duty to protect the victim of another's harm if that person is in what the law calls a 'special relationship' with either the victim or the person who created the harm."].)[9] Here too, the

---

[9] The "special relationship" doctrine addressed in *Brown, supra*, 11 Cal.5th at pages 216 to 222 and *Regents, supra*, 4 Cal.5th at pages 619 to 627 with respect to a defendant's affirmative duty to protect a plaintiff from foreseeable noneconomic injury caused by a third party is different from the "special relationship" at issue in *Biakanja* and *J'Aire* arising from a transaction in which the third party is an intended beneficiary who suffered only economic loss as a result of the transaction. (See *Brown*, at p. 222 [defendant taekwondo association had special relationship with athletes who were sexually abused by

13

intent of the creation of the blocked account was to ensure the estate funds would be available to the intended beneficiaries, which included the Law Firm.

The Supreme Court in *Biakanja, supra*, 49 Cal.2d at page 650 explained "[t]he determination whether in a specific case the defendant will be held liable to a third person not in privity is a matter of policy and involves the balancing of various factors . . . ." The court considered six factors typically described as the *Biakanja* factors: (1) the extent to which the transaction was intended to affect the plaintiff; (2) the foreseeability of harm to the plaintiff; (3) the degree of certainty that the plaintiff suffered injury; (4) the closeness of the connection between the defendant's conduct and the injury suffered; (5) the moral blame attached to the defendant's conduct; and (6) the policy of preventing future harm. (*Ibid.*; see *Gas Leak Cases, supra*, 7 Cal.5th at p. 401 ["Discerning whether there is a special relationship justifying liability [for purely economic loss by a third party] can nonetheless be a subtle enterprise" involving balancing of the *Biakanja* factors]; *J'Aire, supra*, 24 Cal.3d at p. 804 [applying *Biakanja* factors to find duty of care owed to third party lessee]; *Beacon Residential Community Assn. v. Skidmore, Owings & Merrill LLP* (2014) 59 Cal.4th 568, 578

_____

their coach, who was a member of the association]; *Regents*, at p. 613 [universities have special relationship with their students "and a duty to protect them from foreseeable violence during curricular activities"].) However, "[r]elationships that have been recognized as 'special' share a few common features. Generally, the relationship has an aspect of dependency in which one party relies to some degree on the other for protection." (*Regents*, at p. 620; see generally *id.* at pp. 620-621.)

14

["*Biakanja* set forth a list of factors that inform whether a duty of care exists between a plaintiff and defendant in the absence of privity."].)[10]

The Supreme Court in *J'Aire, supra*, 24 Cal.3d at page 806 emphasized that a "key component" in this analysis is the foreseeability of the harm. However, as the Supreme Court

_____

[10] The Supreme Court in *Gas Leak Cases, supra*, 7 Cal.5th at page 401 explained the *Biakanja* balancing test applies a subset of the factors used in *Rowland v. Christian* (1968) 69 Cal.2d 108, 112 to 113 for consideration of whether a defendant owes a duty of care to a plaintiff not in privity with the defendant. (See *Sheen, supra*, 12 Cal.5th at p. 937 [the multifactor test set forth in *Rowland* is "largely similar" to the *Biakanja* factors].) Although the *Rowland* and *Biakanja* factors largely overlap, they are applied in different factual scenarios and in a distinct manner. The *Biakanja* factors "are used to determine whether persons must exercise reasonable care to avoid negligently causing economic loss to others with whom they were *not* in privity (sometimes referred to as third parties)." (*Sheen, supra*, 12 Cal.5th at pp. 937-938.) The "*Rowland* factors serve to determine whether an exception to [Civil Code] section 1714's general duty of reasonable care is warranted.'" (*Sheen*, at p. 938, quoting *Brown, supra*, 11 Cal.5th at pp. 217-218.) In other words, the *Biakanja* factors apply in this type of case, in which the defendant has a special relationship with an intended beneficiary of a transaction who suffers only economic loss, to determine whether based on policy considerations there is a duty "*justifying liability*" (*Gas Leak Cases*, at pp. 400-401, italics added), whereas the *Rowland* factors apply where there is a special relationship between the parties that supports finding the defendant had a duty to protect the plaintiff from noneconomic loss, to determine "whether policy considerations *justify limiting* any resulting duty." (*Brown, supra*, 11 Cal.5th at p. 221, italics added.)

explained in *Bily v. Arthur Young & Co.* (1992) 3 Cal.4th 370, 398 (*Bily*), even where the economic loss is foreseeable, the court has considered factors in addition to those in *Biakanja* in declining to impose a duty of care, for example, where "damage awards threatened to impose liability out of proportion to fault or to promote virtually unlimited responsibility for intangible injury." Rather, "[d]eciding whether to impose a duty of care turns on a careful consideration of the """"the sum total"""" of the policy considerations at play, not a mere tallying of some finite, one-size-fits-all set of factors." (*Gas Leak Cases, supra*, 7 Cal.5th at p. 401; see *Goonewardene v. ADP, LLC* (2019) 6 Cal.5th 817, 841 [declining to impose on third-party payroll company a duty of care to employee of hiring business after "[c]onsidering the "'sum total'" of the relevant considerations of policy"]; *Lucas v. Hamm* (1961) 56 Cal.2d 583, 589 ["Since defendant was authorized to practice the profession of an attorney, we must consider an additional factor not present in *Biakanja*, namely, whether the recognition of liability to beneficiaries of wills negligently drawn by attorneys would impose an undue burden on the profession."].)

In *Bily*, the Supreme Court held a company's auditor owed no general duty of care to investors regarding the preparation of a public report on the financial well-being of the company where the investors had suffered financial losses as a result of statements in the report. (*Bily, supra*, 3 Cal.4th at p. 376.) The *Bily* court concluded it was "certainly" foreseeable the investors would suffer losses from the negligently prepared audit reports, but an auditor "owes no general duty of care regarding the conduct of an audit to persons other than the client." (*Bily*, at pp. 376; see *Gas Leak Cases*, *supra*, 7 Cal.5th at p. 401.) The *Bily* court observed, similar to the context of bystander liability for

16

negligent infliction of emotional distress, "'[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury.'" (*Bily*, at p. 399, quoting *Thing v. La Chusa* (1989) 48 Cal.3d 644, 668; see *Gas Leak Cases*, at p. 401.) The court held auditors' potential multi-billion-dollar liability for financial losses suffered by third parties who rely on public audit reports was out of proportion to fault and raised other policy concerns. (*Bily*, at pp. 401-402; see *Goonewardene v. ADP, LLC, supra*, 6 Cal.5th at p. 838; *Gas Leak Cases*, at pp. 401-402.)

Although Chase highlights this language in *Bily* that foreseeability cannot alone support a duty owed to third parties, Chase ignores *Bily*'s finding the auditor did owe a duty of care on a negligent misrepresentation theory to the "specifically intended beneficiaries of the audit report who are known to the auditor and for whose benefit it renders the audit report." (*Bily, supra*, 3 Cal.4th at pp. 406-407.) As the Supreme Court observed in *Gas Leak Cases, supra*, 7 Cal.5th at pages 401 to 402, the *Bily* court "limited auditor liability to claims for negligent misrepresentation brought by plaintiffs who—like the plaintiffs in *Biakanja* and *J'Aire*—were 'specifically intended beneficiaries' of the defendant's conduct."

Here, as in *Biakanja* and *J'Aire*, Chase and the Law Firm had a special relationship because the Law Firm was an intended beneficiary of the blocked account order and acknowledgment, which limited distribution of estate funds.[11] The Law Firm was

---

[11] Although the Law Firm is technically a creditor of the estate (see, e.g., Prob. Code, § 11420(a)(1) [listing expenses of

17

authorized by statute to be paid for its legal fees from the estate (Prob. Code, § 10810, subd. (a)),[12] and further, the Probate Court order authorized payment of approximately $66,000 to the Law Firm for this purpose in the final probate order. When Chase opened the blocked account on October 31, 2018, it did so pursuant to the probate court's blocked account order that specified the funds from the proceeds of the sale of the estate's real property must be deposited "in a blocked account to be withdrawn only on court order." And in moving for summary judgment, Chase acknowledged it "owe[d] a duty and obligation to comply with court orders" (although it disputed whether that duty was owed to the Law Firm). We therefore apply the *Biakanja* factors to determine whether Chase owed a duty of care to the Law Firm in making distributions from the blocked account.

2. *The* Biakanja *factors support a finding Chase owed a duty to the Law Firm in distributing funds from the blocked account*

The Law Firm contends the *Biakanja* factors favor a finding Chase owed it a duty of care. Chase does not address the *Biakanja* factors in its respondent's brief other than foreseeability, instead focusing on the limited duty of care owed

---

administration as the highest priority debt of the estate]), for simplicity we describe it as a beneficiary because its claim to a portion of the blocked funds is similar to that of the named beneficiaries.

[12] Further undesignated statutory references are to the Probate Code.

by banks to non-depositors.[13]  The Law Firm is correct.  The *Biakanja* factors support a finding Chase had a duty to use reasonable care in distributing funds from the blocked account.

> a.    *The transaction was intended to affect the Law Firm*

As discussed, the first *Biakanja* factor is "the extent to which the transaction was intended to affect the plaintiff." (*Biakanja, supra*, 49 Cal.2d at p. 650.)  Chase does not dispute that it agreed to comply with the probate court's orders in distributing funds from the blocked account.  Pursuant to the statutory scheme, the attorney for the personal representative in a probate matter "shall" receive compensation from the estate for "ordinary services" provided by the attorney pursuant to statutory guidelines based on the value of the estate.  (§ 10810, subd. (a); see *Estate of Trynin* (1989) 49 Cal.3d 868, 873 ["An

---

[13]    Chase argues in its respondent's brief that there are seven theories under which it is not liable for injury caused to the Law Firm, two of which we discuss in this section (the economic loss rule and foreseeability of harm).  We address below Chase's arguments that it did not owe a duty to the Law Firm because, as a bank, it did not owe a duty to depositors or non-depositors to police activity in a depositor's account for suspicious activity.  We do not reach Chase's argument that it did not owe a fiduciary duty to the Law Firm, because the Law Firm only asserts that it had a special relationship with Chase, not that it had a fiduciary relationship.  Likewise, because we conclude Chase's duty to the Law Firm arose from the plain language of the blocked account order and Acknowledgment, we do not reach whether any statements by Chun supported a duty owed by Chase to the Law Firm.

attorney who has rendered services to an estate's representative may obtain compensation by petitioning the superior court sitting in probate for an order requiring the representative to make payment to the attorney out of the estate."].)[14] Under this statutory scheme, "an attorney who has performed probate work is a person interested in the estate." (*Trynin*, at p. 873.) Consistent with sections 10810 and 10811, the final probate order specified the Law Firm was "directed to receive" $16,000 in "[s]tatutory compensation for services rendered," approximately $44,000 for "[e]xtraordinary compensation for legal services rendered," and approximately $6,000 in costs.

Moreover, under the Probate Code, expenses of administration (including attorneys' fees) have priority over all other debts of the estate. (§ 11420, subd. (a)(1) ["expenses of administration incurred that are reasonably related to the administration of that property by which obligations are secured shall be given priority" over secured debts].) Accordingly, the blocked account order and acknowledgment, by preventing disbursement of the estate funds in the blocked account without a court order authorizing payment, were intended to affect the Law Firm, which had a priority right to those funds. This factor therefore weighs strongly in favor of finding a duty of care.

---

[14] Compensation for ordinary legal services is commonly known as "'statutory'" or "'ordinary'" compensation. (*Estate of Hilton* (1996) 44 Cal.App.4th 890, 894-895; see *Estate of Wong* (2012) 207 Cal.App.4th 366, 374-375.) Compensation for services that are not involved in the typical probate case, commonly known as "extraordinary services," "may" be paid out of estate assets at the discretion of the probate court in an amount the court determines is "just and reasonable." (§ 10811, subd. (a); see *Wong*, at 375; *Hilton*, at p. 895.)

20

b.      *The foreseeability and certainty factors*

Because the establishment of the blocked account was intended to benefit the Law Firm, the second *Biakanja* factor (foreseeability of harm) also weighs heavily in favor of finding a duty of care.  (*Biakanja, supra*, 49 Cal.2d at 650; see *J'Aire, supra*, 24 Cal.3d at p. 804 [because contract between owner and contractor was for renovation of restaurant operated by plaintiff, "it was clearly foreseeable that any significant delay in completing the construction would adversely affect [plaintiff's] business"]; *Sabetian v. Exxon Mobil Corporation* (2020) 57 Cal.App.5th 1054, 1078 ["Typically, as in *J'Aire* and *Stewart* [*v. Cox* (1961) 55 Cal.2d 857], the first two . . . factors operate in tandem—because the underlying contract was intended to affect the plaintiffs, the harm to the plaintiffs as a result of the defendants' negligence was a fortiori foreseeable."].)  It was foreseeable that distributing the entirety of the funds in the blocked account to one beneficiary, without a court order directing disbursement of the funds, would harm the other beneficiaries, including the Law Firm.

With respect to the third *Biakanja* factor (the degree of certainty that the plaintiff suffered injury), it is undisputed the Law Firm suffered injury as a result of Chase's allowing Brumfield to withdraw all the funds in the blocked account without a court order directing it to do so, depriving the Law Firm of any payment.  There is likewise a close connection between Chase's conduct in distributing all the funds to Brumfield and the Law Firm's injury (the fourth factor).  (*Biakanja, supra*, 49 Cal.2d at 650; see *Chang v. Lederman* (2009) 172 Cal.App.4th 67, 83 ["[F]rom the allegations in [the plaintiff's] complaint there appear to be no intervening

21

circumstances that might have broken the causal connection between [the defendant's] conduct and [the plaintiff's] damage (the fourth factor)."].)[15]

### c. *We do not attach moral blame to Chase's conduct*

We recognize Chase relied on a mistaken interpretation of the final probate order in releasing all of the estate funds to Brumfield; there is no evidence the distribution in any way benefitted Chase. And but for Brumfield's conduct in absconding with the funds, there would have been no injury. Thus, we do not attach moral blame to the negligent conduct of Chase. This factor therefore favors Chase.

### d. *The policy of preventing future harm supports finding a duty*

The goal to prevent future harm supports finding a bank owes a duty of care to an intended beneficiary where a bank releases funds from a blocked account without court authorization. Chase agreed to comply with the probate court order directing that the estate funds be placed in a blocked account, withdrawable only pursuant to court order, and it allowed the estate funds to be withdrawn without a proper order. The probate system reflects a fundamental recognition that the preservation and distribution of the assets of the deceased for beneficiaries require special care and court supervision. And third party beneficiaries are typically powerless to safeguard their own interests. For example, a beneficiary would not know,

---

[15]     We address Chase's causation arguments further below.

22

as here, that funds have been distributed from the estate to a person lacking a right to the funds until it is too late.

The procedure in the Probate Code for creating and limiting disbursements from blocked accounts addresses this problem. Pursuant to section 9703, subdivision (a), "Upon application of the personal representative, the court may, with or without notice, order that money or other personal property be deposited [in an account] and be subject to withdrawal only upon authorization of the court." (See § 8483 [providing that amount of bond may be reduced where deposited funds may only be withdrawn upon court order pursuant to section 9703].) This longstanding requirement was first enacted in 1909 in section 91 of the Bank Act (Stats. 1909, ch. 76, § 91, p. 105), which provided, "Any court, having appointed and having jurisdiction of any executor, administrator, guardian, assignee, receiver, depositary, or trustee, upon the application of such officer or trustee, or upon the application of any person having an interest in the estate . . . may authorize such officer or trustee to deposit any moneys then in his hands, or which may come into his hands thereafter, and until the further order of said court, with any such trust company . . . . *Such deposits shall be paid out only upon the orders of said court.*" (Stats. 1909, ch. 76, § 91, p. 105, italics added; see Stats. 1909, ch. 76, § 93, p. 106 [authorizing reduction in bond after deposit with trust company]; see also Stats. 1909, ch. 76, § 51, p. 98 [authorizing deposit in bank instead of trust company].) Holding banks accountable to intended beneficiaries for the negligent disbursement of funds from blocked accounts will create an incentive for banks to take steps to ensure estate funds placed in a blocked account are not distributed without clear court authorization, furthering the goal

of protecting beneficiaries, who could not otherwise safeguard their interests.

3. *The cases limiting a bank's duty to police customer accounts do not foreclose a finding of duty*

Chase contends that imposing a duty on a bank to protect a non-depositor from the potential fraud of an authorized signatory would be contrary to California law that, with limited exceptions, neither imposes a duty on banks to police the account activity of its depositors nor imposes a duty of care owed to non-depositors. Although Chase is correct that banks generally do not have a duty to monitor accounts for suspicious activity, the duty Chase owes to the Law Firm does not arise from a duty to ferret out suspicious activity, but rather, from its receipt of estate funds and placement of the funds in a blocked account, and its special relationship with intended beneficiaries of those funds. The duty to act with reasonable care in limiting distributions from a blocked account to those authorized by court order, to protect the interests of intended beneficiaries of the funds, falls squarely within the obligations placed on a bank consistent with the policy considerations set forth in *Biakanja*. Further, most courts that have analyzed a bank's limited duty of care to monitor accounts have, as we do here, considered the policy factors set forth in *Biakanja* (or *Rowland v. Christian* (1968) 69 Cal.2d 108, 112-113 (*Rowland*)) in determining the breadth of that duty.

Banks owe a long-recognized duty of care to their depositors. (*Bullis v. Security Pac. Nat. Bank* (1978) 21 Cal.3d 801, 808 (*Bullis*) [a bank has "a duty to act with reasonable care in its transactions with its depositors"]; *Basch v. Bank of America* (1943) 22 Cal.2d 316, 321 ["a bank pays a forged check at its

24

peril"]; *Pacific Finance Corp. v. Bank of Yolo* (1932) 215 Cal. 357, 361 [banks have a duty to ensure funds are not "improperly disbursed"]; *Chazen v. Centennial Bank* (1998) 61 Cal.App.4th 532, 543 (*Chazen*).)

In *Bullis, supra*, 21 Cal.3d at pages 805 to 806, the Supreme Court considered a bank's failure to follow its internal protocols and the Probate Code by allowing one of two co-executors to withdraw funds from an estate's account.[16]  In affirming the judgment in favor of the estate, the court concluded the bank "clearly had a duty to act with reasonable care in its transactions with its depositors, including the . . . estate." (*Id.* at p. 808.)  Regarding breach, the court found there was "substantial evidence to support the trial court's finding that [the bank's] failure to require the signatures of both co-executors on withdrawals fell below the standard of care owed to the estate." (*Id.* at p. 811.)

Although banks have a duty to act with reasonable care toward their depositors, including to ensure a person making a withdrawal has authority to do so, Financial Code section 1451 addresses the longstanding principle first codified in the 1925 Bank Act (Stats. 1925, ch. 312, (Assem. Bill No. 725 (46th Sess.) § 16a) that banks have no duty to monitor withdrawals made by authorized parties in an authorized manner.  (See *Kurtz-Ahlers, LLC v. Bank of America, N.A.* (2020) 48 Cal.App.5th 952, 956 [the contractual relationship between a bank and a depositor "'does

---

[16]     The *Bullis* court considered former section 570 (now codified in section 9630), which provided that "one of two co-executors may act alone [o]*nly* if the other co-executor is absent from the state or legally disqualified from acting." (*Bullis, supra*, 21 Cal.3d at p. 810.)

not involve any implied duty "to supervise account activity" [citation] or "to inquire into the purpose for which the funds are being used""""]; *Chazen, supra*, 61 Cal.App.4th at 537 ["a bank has no duty to monitor trust accounts for breaches of fiduciary duty"].)

Financial Code section 1451 provides, "When the depositor of a commercial or savings account has authorized any person to make withdrawals from the account, the bank, in the absence of written notice otherwise, may assume that any check, receipt, or order of withdrawal drawn by such person *in the authorized form or manner*, including checks drawn to his personal order and withdrawal orders payable to him personally, was drawn for a purpose authorized by the depositor and within the scope of the authority conferred upon such person."  (Italics added.) Section 1451's limitation on the bank's duty to supervise withdrawals is designed to protect depositor privacy and to facilitate efficient processing of banking transactions.  (*Kurtz-Ahlers, supra*, 48 Cal.App.5th at pp. 957, 960-961; *Chazen, supra*, 61 Cal.App.4th at p. 539.)

The Supreme Court in *Sun 'n Sand, Inc. v. United California Bank* (1978) 21 Cal.3d 671, 695 (*Sun 'n Sand*) carved out a narrow duty of inquiry for banks to make reasonable inquiries when "checks, not insignificant in amount, are drawn payable to the order of a bank and are presented to the payee bank by a third party seeking to negotiate the checks for his own benefit."  The court concluded that under the alleged facts the bank breached its duty to a third-party company where the bank allowed the company's employee to deposit in her own account checks made out to the bank (not to the employee), which were intended to pay the company's bills.  (*Id*. at pp. 678-679.)  In

26

concluding the bank owed the company a duty to protect it from the suspicious conduct of its employee, the court considered the *Rowland* factors and found that because the loss was reasonably foreseeable, the bank owed a limited duty of care to the company. (*Id.* at p. 695.)

Aside from the narrow *Sun 'n Sand* exception, courts have refrained from imposing on banks a duty to third parties to monitor bank account transactions for suspicious activity. (See *Kurtz-Ahlers, supra*, 48 Cal.App.5th at pp. 958-959, 961 [bank owed no duty to company where company's bookkeeper fraudulently deposited company checks into her own account because bookkeeper appeared authorized to deposit checks and policy considerations strongly weighed against finding a new duty to monitor transfers from one depositor (the company) to another]; *Casey v. U.S. Bank Nat. Assn.* (2005) 127 Cal.App.4th 1138, 1151 [banks did not owe duty of care to third-party bankruptcy estate where officers of debtor corporation allegedly opened suspicious bank accounts to perpetrate fraud because "the banks' alleged knowledge of the [officers'] suspicious account activities—even money laundering—*without more*, does not give rise to tort liability for the banks"]; *Karen Kane, Inc. v. Bank of America* (1998) 67 Cal.App.4th 1192, 1202 [finding after considering *Rowland* factors that bank had no duty to company whose checks were fraudulently cashed by its employee where company had "no relationship with the Bank, and the Bank did nothing more than allow its customer . . . to deposit checks into its own account"]; *Chazen, supra*, 61 Cal.App.4th at pp. 545-546 [bank did not owe duty of care to third parties who were not known to bank based on broker's improper disbursements from

27

trust accounts where the broker was authorized to make the disbursements].)

Unlike these cases, in which the courts have confirmed there is no (or a very limited) duty to third parties based on a bank's duty to monitor depositor accounts where transactions are on their face authorized, in this case Brumfield made an *unauthorized* withdrawal of funds from the blocked account because the final probate order did not specifically direct Chase to distribute funds from the blocked account to Brumfield (or anyone else). Absent a court order with instructions on the amounts to pay Brumfield and the Law Firm, it was unclear how much money should have been distributed to each because the total amount allocated to Brumfield and the Law Firm exceeded the amount of estate funds in the blocked account.[17] It was for the court to decide how to allocate the available funds between Brumfield and the Law Firm, and then for the court to issue an order directing Chase on how to distribute the funds from the blocked account. The final probate order did not do this.

---

[17] Pursuant to section 11420, subdivision (b), subject to exceptions not applicable here, "the debts of each class are without preference or priority one over another. No debt of any class may be paid until all those of prior classes are paid in full. If property in the estate is insufficient to pay all debts of any class in full, each debt in that class shall be paid a proportionate share." Because payment of $16,000 to Brumfield plus the $66,325.14 owed to the Law Firm ($16,000 for ordinary services, $44,151.25 for extraordinary services, and $6,173.89 in costs) were in the same debt class (costs of administration), they should have each received a proportionate share of the $47,383.47 in the blocked account.

28

C. *The Law Firm Created a Triable Issue of Fact as to Whether Chase Used Reasonable Care in Implementing the Blocked Account Order*

Chase contends it did not breach any duty it owed to the Law Firm in distributing estate funds pursuant to the final probate order because it followed the order in releasing the funds in the blocked account to Brumfield as the only authorized signatory on the account. We agree with the Law Firm that the language of the final probate order (in the absence of extrinsic evidence) supports a contrary conclusion.

The interpretation of a court order is a question of law we review de novo. (*Dow v. Lassen Irrigation Co.* (2022) 79 Cal.App.5th 308, 326; *American Civil Rights Foundation v. Los Angeles Unified School Dist.* (2008) 169 Cal.App.4th 436, 448.) "The same rules apply in ascertaining the meaning of a court order or judgment as in ascertaining the meaning of any other writing." (*Mendly v. County of Los Angeles* (1994) 23 Cal.App.4th 1193, 1205; accord, *Dow*, at p. 326; *In re Ins. Installment Fee Cases* (2012) 211 Cal.App.4th 1395, 1429 ["'In construing orders they must always be considered in their entirety, and the same rules of interpretation will apply in ascertaining the meaning of a court's order as in ascertaining the meaning of any other writing.'"]; see *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1125-1126 ["The rules governing the role of the court in interpreting a written instrument are well established. . . . Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms."].)

Contrary to Chase's contention, the final probate order does not direct Chase to unblock the account for release of all the

funds to Brumfield, who would (according to Chase) then be responsible for distribution of the funds to the other beneficiaries, including the Law Firm. While possibly Brumfield's signature would have been necessary to effectuate the release of funds to the Law Firm and other beneficiaries, that does not mean she could withdraw any funds from the blocked account without a court order directing Chase to release the funds to Brumfield. Further, section 9704 provides that the bank, upon receipt of an order for distribution of money or personal property from an account, "may deliver the property directly to the distributees." And to the extent there was a lack of clarity in how the funds should have been distributed, Chase should have sought guidance from the court or required the Law Firm to obtain a more specific order.

A comparison between the final probate order and Judicial Counsel Form MC-358 (order authorizing withdrawal of funds from blocked account)[18] highlights the flaws in Chase's position that the final probate order authorized distribution of the estate funds to Brumfield without a further order. Judicial Council Form MC-358 provides with respect to a blocked account that the "Petitioner is authorized to withdraw, and the depository is ordered, on presentation of a file-stamped copy of this order, to permit the petitioner to withdraw" the listed amount. The order specifies each payee and the amount to be distributed to the payee. By contrast, the final probate order approves the amount Brumfield, the Law Firm, and the beneficiaries are "authorized

---

[18] The Judicial Council website provides that form MC-358 "[s]tates the court's decision (order) allowing funds to be taken out (withdrawn) from a blocked account (a bank or other account requiring a court order to deposit or withdraw funds)."

30

and directed to receive," but nowhere does the order authorize Brumfield to withdraw, or Chase to pay, specific amounts to each payee.  Although parties do not need to use the Judicial Council template, adherence to it (with specific directions to the bank) ensures the distributions are authorized by court order.

Accordingly, the Law Firm created a triable issue of fact as to Chase's breach of its duty of care owed to the Law Firm.

D.     *The Law Firm Raised a Triable Issue of Fact as to Causation*

"The element of causation requires there to be a connection between the defendant's breach and the plaintiff's injury."  (*Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627, 645.) "Causation exists where 'the defendant's breach of its duty to exercise ordinary care was a substantial factor in bringing about plaintiff's harm.'"  (*Janice H. v. 696 North Robertson, LLC* (2016) 1 Cal.App.5th 586, 598; accord, *Beebe v. Wonderful Pistachios & Almonds LLC* (2023) 92 Cal.App.5th 351, 370 ["The 'substantial factor' test for causation is appropriate in all tort actions."]; see *Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 661 ["We have previously observed that '[i]n cases where concurrent independent causes contribute to an injury, we apply the "substantial factor" test' [citation], which requires the plaintiff to 'show some substantial link or nexus between omission and injury.'"].)  Like breach and injury, causation is a fact-specific issue for the trier of fact.  (*Kesner, supra*, 1 Cal.5th at p. 1144 ["Breach, injury, and causation must be demonstrated on the basis of facts adduced at trial, and a jury's determination of each must take into account the particular context in which any act or injury occurred."].)

Chase contends the Law Firm cannot establish causation because Brumfield's misconduct was effectively a supervening cause of the Law Firm's injuries.  "Under traditional tort principles, once a defendant's conduct is found to have been a cause in fact of the plaintiff's injuries, the conduct of a third party will not bar liability unless it operated as a superseding or supervening cause, so as to break the chain of legal causation between the defendant's conduct and the plaintiff's injuries." (*Cole v. Town of Los Gatos* (2012) 205 Cal.App.4th 749, 770; accord, *Coyle v. Historic Mission Inn Corp., supra*, 24 Cal.App.5th at p. 645.)  "The third party's misconduct ordinarily will not be regarded as a supervening cause if the misconduct itself was foreseeable to the defendant."  (*Cleveland v. Taft Union High School Dist.* (2022) 76 Cal.App.5th 776, 810, fn. 15; see *Cole*, at p. 770.)

Foreseeability is therefore the touchstone of the supervening cause analysis.  "'If the likelihood that a third person may act in a particular manner is the hazard or one of the hazards which makes the actor negligent, such an act whether innocent, negligent, intentionally tortious, or criminal does not prevent the actor from being liable for harm caused thereby.'" (*Bigbee v. Pacific Tel. & Tel. Co.* (1983) 34 Cal.3d 49, 58, quoting Rest.2d Torts, § 449, fn. omitted ["It is of no consequence that the harm to plaintiff came about through the negligent or reckless acts of [a third party]."]; accord, *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 47.  As the Supreme Court explained in *Bullis, supra*, 21 Cal.3d at pages 812 to 813, in affirming a judgment finding the bank liable for the unauthorized withdrawal of funds from an estate's account, "[The bank] asserts that the imposition of liability would punish [the bank] for its

failure 'to control the conduct of another,' i.e., [the co-executor of the estate]. [Citation.] This contention overlooks the fact that the trial court merely reaffirmed the obvious proposition that [the bank] owed a duty of due care to its depositors. [The bank] was held liable for the estate's loss because *its* conduct, in opening and maintaining the estate's account, did not meet the standard of reasonable care expected of a bank. Its negligent conduct resulted in a reasonably foreseeable injury. Thus, liability was based on [the bank's] own negligence, not on a breach of any duty to control [the co-executor]."

As discussed, while Brumfield's own misconduct contributed to the Law Firm's injuries, and improper withdrawals of estate assets are precisely the sort of hazard the blocked account was created to prevent, there is a question of fact whether her misconduct was foreseeable. Accordingly, because Chase failed to establish it owed no duty to the Law Firm, and the Law Firm created a triable issue of fact as to breach of duty and causation, we reverse the trial court's order granting summary judgment.

## DISPOSITION

The judgment is reversed.  The trial court is directed to vacate its order granting Chase's motion for summary judgment and to enter a new order denying the motion.  The Law Firm is to recover its costs on appeal.

FEUER, J.

We concur:


SEGAL, Acting P. J.


ESCALANTE, J.*

---

\*      Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.